Louis J. Best and Manila Best, His Wife v. Commissioner.
Best v. Commissioner
Docket No. 34084.
United States Tax Court
T.C. Memo 1954-170; 1954 Tax Ct. Memo LEXIS 74; 13 T.C.M. (CCH) 948; T.C.M. (RIA) 54276; October 12, 1954, Filed E. C. Pommerening, Esq., for the petitioners. John L. Pedrick, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against the petitioners for the taxable year 1948 in the amount of $994.28. The question is as to the deductibility from gross income of a loss sustained in the operation of a dairy farm. Findings of Fact Petitioners are husband and wife, and reside in Milwaukee, Wisconsin. They filed a joint income tax return for 1948 with the collector of internal revenue for Wisconsin. Louis J. Best, sometimes referred to herein as petitioner, is president and general manager of Best Lumber & Fuel Company, of Milwaukee, a corporation, which is engaged in the retail lumber and coal *75 business. The land and buildings occupied by the company in the operation of its business are rented from the Best Lumber Company, another corporation, of which petitioner is and was president and general manager. The Best Lumber & Fuel Company was originally a family business. It was incorporated at some undisclosed date and the Best family owned all of its stock. In 1937, the petitioner owned all of the stock of both the Best Lumber & Fuel Company and the Best Lumber Company. In that year he disposed of the controlling interest in the Best Lumber & Fuel Company, receiving therefor cash and $15,000 in preferred stock. [1] He continued to own the stock of the Best Lumber Company. After the above transaction, petitioner left the employment of Best Lumber & Fuel Company, and with his family, moved to a farm which he owned at Random Lake, about twenty-five *76 miles north of Milwaukee. The farm consisted of about forty acres, with approximately fifteen or sixteen acres under cultivation and the rest in pasture and woodland. It was located on a lake and had about eighteen hundred feet of lakefront. The buildings on the farm consisted of a small residence; a barn, capable of holding about eighteen cows; a boathouse on the lakeshore, where two row boats were kept; and a one-room building, 25 feet by 40 feet, made of building board, which was used for entertaining purposes. It was petitioner's intention to operate the farm as a dairy farm, thereby supplementing his anticipated income from the Best Lumber Company and from his preferred stock in the Best Lumber & Fuel Company. Pursuing that purpose, he acquired about a dozen dairy cows. They were not pure bred cows, but a mixture of Jersey and Holstein. At that time milk was selling for $2.75 per hundred pounds for 3.6 test milk. Petitioner's cows produced an average of 4.1 milk, which sold for $3 per hundred pounds. It was petitioner's thought that 8 of the 12 cows would be giving milk at all times and would average about 15 pounds each per milking, or 30 pounds each per day. Within a year *77 after petitioner moved to the farm, the Best Lumber & Fuel Company encountered financial difficulties, and petitioner was requested by its creditors to return and try to work the business out of those difficulties. He moved his family back to Milwaukee and again assumed control of the company. He had an agreement that he would receive one-third of the stock, if he successfully brought the company out of its financial straits. He succeeded in that undertaking and one-third of the stock of the company was issued to him. Subsequently, and at some undisclosed date, he and his family acquired all of the stock. In 1943 or 1944, petitioner again moved to the Random Lake farm. He re-moved to Milwaukee in 1946, however, and has not since resided at the farm. Petitioner had one employee, who devoted his full time to the operation of the dairy farm, and was paid $100 per month. He lived in Random Lake, and not at the farm. Petitioner and his son assisted with the planting in the spring and sometimes operated a tractor in connection with the farming operations. The crops were corn and alfalfa, which were used as feed for the dairy cattle. Outside help was also employed to assist with the spring *78 planting and fall harvesting. The milk from the dairy was sold to the Cedar Valley Dairy Company. The dairy company picked up the milk at the farm, but petitioner paid for the transportation. After the milking of the cows, the only operation, in so far as the milk was concerned, was that of cooling it and putting it in the cans for pick up. It was petitioner's intention to build up his dairy herd through the breeding of his cows to a pure bred bull. Beginning about 1946, however, the Bangs disease was encountered and some of his cows had to be disposed of. After that, he switched over to artificial insemination in his efforts to develop a better herd. This method was continued until he sold the herd in 1950. During 1948 petitioner had about 12 cows, of which an average of 8 produced milk regularly. The dairy farming operation was never the success petitioner envisioned, and, except for one year, when a small profit was realized, it was operated at a loss. In 1945, the farm receipts were $1,727.65, while expenses were $3,229.02. In 1947, receipts were $1,522.34 and expenses $3,772.83. The receipts included the proceeds from the occasional sale of cows and calves. Petitioner *79 belonged to numerous organizations, and beginning about 1940, it was his practice to offer his farm, more particularly the lakefront area, for outings for those organizations. Included were Sunday school groups, bowling groups and various Masonic groups. Some of the individuals in those groups were prospective customers for the Best Lumber & Fuel Company and some of them did become good customers. Petitioner also entertained individual contractors and others which were doing business with the company. The use of the farm for that purpose continued through the taxable year. Petitioner's employees took no part in entertaining the guests or looking after the lawn or the picnic area where the guests gathered for their outings. The gatherings were usually in a grove on the lakeshore. None of the milk produced on the farm was used in the entertaining of the guests or for petitioner's family use. Petitioner at times did grow vegetables at the farm for family consumption, but the gardening was not done by his employees. The Best Lumber & Fuel Company paid for lunches, refreshments, etc., served to the individuals and parties who were entertained in the lakeshore area. It also at times *80 supplied a caterer. When petitioner took small groups out to the lakeshore, he did the necessary work, such as the grilling of steaks, and outside help was not brought in. For the years 1944 through 1948, the salary received by petitioner from the Best Lumber & Fuel Company was as follows: 1944
$ 3,600.00
1945
3,354.00
1946
12,819.84
1947
13,500.00
1948
15,358.75
Petitioner sold his farm in 1950 to Best Lumber & Fuel Company for approximately $40,000. Agricultural land in that area was selling for about $500 an acre, but land abutting the lake had a greater value. On their income tax return for 1948, petitioners reported $1,519.26 as the receipts from the operation of the farm, and total expenses at $3,598.36. These expenses, as reported, consisted of salaries and wages, $1,484.38; taxes, $52.38; depreciation, $800; repairs and other expenses, $1,261.60. The item of repairs and other expenses was further broken down as follows: Feed, $663.05; veterinary, $8.75; repairs and painting, $555.40; miscellaneous, $9.40; truck repairs, $25. The depreciation claimed was on the barn, a tractor and other farm equipment. The feed was purchased for the dairy cows. *81 The item $555.40 reported under repairs was expended in repainting the barn and in replacing its wooden floors with cement. During 1948 the petitioner was in the business of operating a dairy farm. There was no connection between the dairy farm operation and petitioner's employment as president and general manager of Best Lumber & Fuel Company. The petitioners, on their income tax return for 1948, in arriving at adjusted gross income, deducted from gross income the above items of expense which were incurred and paid in connection with the dairy farm operation. In arriving at net income, a standard deduction of $1,000 was deducted from adjusted gross income. The respondent, in his determination of the deficiency herein, disallowed the farm expenses so deducted in arriving at adjusted gross income, stating "it has not been established by you that the loss claimed is deductible under the provisions of Section 22(n), 23(a), 23(e) or any other section of the Internal Revenue Code." Opinion In computing adjusted gross income, section 22(n)(1) of the Internal Revenue Code of 1939[1] provides for the deduction from gross income of "the deductions allowed by section 23 which are attributable *82 to a trade or business carried on by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee." And in computing net income, section 23(aa) of the Code [2] gives an individual taxpayer the option of a standard deduction in an amount equal to 10 per centum of adjusted gross income or $1,000, whichever is the lesser, in lieu of the deductions by items otherwise allowable under section 23. Once the taxpayer has made his election as between the itemized deductions under section 23 and the standard deduction, that election is irrevocable. *83 In the instant case, the petitioners, in their return, claimed deduction of their section 23 dairy farming deductions, in arriving at their adjusted gross income, as provided in section 22(n)(1). And in arriving at their net income, they elected to take the standard deduction provided under section 23(aa)(1)(A), as they were privileged to do. Such reporting of their income was in accord with the facts and the statute. The position of the respondent that the dairy farming operation was not a trade or business, within the meaning of the statute, is not well taken, and the argument of petitioners' counsel with respect to petitioner's employment by the Best Lumber & Fuel Company and the entertainment at the farm of customers and potential customers of that company is beside the point. We are unable to conclude, however, that the $555.40 deducted under the heading "Repairs & Painting" represented expenditures deductible under section 23, as it must, if it is to be deducted from gross income under section 22(n)(1) in arriving at adjusted gross income. It was petitioner's testimony that the amount in question was expended in repainting the barn and in replacing its wooden floor with *84 a cement floor, thereby indicating capital expenditures, and not expense items. As to the $555.40, the respondent is sustained. Decision will be entered under Rule 50. Footnotes
1. Although the record is not clear, the tenor of the testimony and the discussion of counsel leads us to believe that petitioner disposed of his stock in Best Lumber & Fuel Company, although there appear in the record some references to a sale or disposition of the business, which could have meant a sale by the corporation.↩
1. SEC. 22. GROSS INCOME. * * *
(n) Definition of "Adjusted Gross Income." - As used in this chapter the term "adjusted gross income" means the gross income minus - (1) Trade and Business Deductions. - The deductions allowed by section 23↩ which are attributable to a trade or business carried on by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee; 2. Sec. 23. DEDUCTIONS FROM GROSS INCOME. * * *
(aa) Optional Standard Deductions for Individuals. - (1) Allowance. - In the case of an individual, at his election a standard deduction as follows: (A) Adjusted Gross Income $5,000 or More. - If his adjusted gross income is $5,000 or more, the standard deduction shall be $1,000 or an amount equal to 10 per centum of the adjusted gross income, whichever is the lesser, except that in the case of a separate return by a married individual, the standard deduction shall be $500. * * *
(3) Method and Effect of Election. - * * *
(C) If the taxpayer does not signify, in the manner provided by subparagraph (A) or (B), his election to take the standard deducton, it shall not be allowed. If he does so signify, such election shall be irrevocable.↩